STATE OF CONNECTICUT *v.* PHILIP C. TRAFICONDA
(14310)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued May 1—decision released August 4, 1992

*Bruce A. Sturman,* public defender, for the appellant (defendant).

*Kevin T. Kane,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti, Sr.,* for the appellee (state).

BERDON, J. The defendant, Philip C. Traficonda, was charged in an information with the crime of murder in violation of General Statutes § 53a-54a.[1] At the defendant's request, the trial court charged the jury on the lesser included offenses of manslaughter in the first degree in violation of General Statutes § 53a-55,[2]

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-55 (a) provides: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

and criminally negligent homicide in violation of General Statutes § 53a-58.[3] After a jury verdict of guilty of the crime of murder, the defendant was sentenced by the court to a term of life imprisonment. The defendant appealed from the judgment of conviction to this court.[4] We affirm the judgment of the trial court.

On appeal, the defendant claims that the trial court improperly denied his motion for judgment of acquittal because the state did not produce sufficient evidence to establish beyond a reasonable doubt that the defendant intended to kill his wife, and that the trial court improperly denied his motion for a mistrial following the improper and prejudicial testimony of a witness that deprived him of a fair trial.

The following evidence was presented at trial. On June 3, 1989, at approximately 4:35 a.m., Officers Bernard Douton and Bruce Thompson of the Waterford police department responded to a report of a shooting at the defendant's address. The defendant had called 911 to report the shooting. Shortly after they arrived at the scene, the officers saw the defendant walking down the driveway towards them, yelling that "he had shot his wife and to hurry up and get inside." The victim, Terry Traficonda, died instantly from the gunshot wound to the neck area.

The defendant told the police that he and his wife had been discussing hunting when she expressed an interest in learning how the weapon operated. The defendant said that his wife had been lying on the couch and he had been sitting in a chair, demonstrating how

---

[3] General Statutes § 53a-58 (a) provides: "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle."

[4] General Statutes § 51-199 provides in pertinent part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

his "30-30" caliber Winchester rifle worked, when the gun discharged accidentally and struck his wife. The defendant claimed that he "freaked out," threw the gun down, and ran to his wife's side.

Officer Mark Willard testified that at the police station, the defendant's mood had shifted from crying and sobbing, to somber and straight, to telling jokes, and back again. Willard testified that the defendant had said that he loved his wife and son, "Then he kind of clarified it, said he loved the bitch. He said that maybe he should have shot himself. Then he said, 'No, life could never get that bad. I would never do [that to] myself.' " Blood alcohol tests, performed at 5:36 a.m. and 6:14 a.m. revealed blood alcohol levels of .219 and .199, respectively.

The defendant's 911 call, which had been recorded by the Waterford police department, was later copied and analyzed by Detective Stuart Clark, who heard the sounds of a lever on a lever-action rifle being worked back and forth rapidly, and the sounds of a storm door being opened and closed.[5] An analysis of the tape by the Engineering Research Facility of the Federal Bureau of Investigation disclosed that the unloading of the defendant's rifle made a unique sound which was consistent with the unloading sound on the tape.

The police discovered the defendant's rifle, which holds a maximum of six bullets, in the hallway near its case. One spent "30-30" caliber cartridge was discovered on the floor near the sofa on which the victim was found, and one live "30-30" caliber round was found underneath a cushion on the couch. Four live rounds were discovered in an adjoining neighbor's backyard, approximately thirty to fifty feet from the defendant's backdoor. Marks on the one spent cartridge were con-

---

[5] These sounds were heard on the tape after an oral conversation and after the dispatcher told the defendant to hold the line.

sistent with chamber markings from the defendant's rifle. Four of the five live rounds contained ejector markings from the defendant's rifle. The markings on the remaining live round could not be identified. A total of six rounds, both discharged and undischarged, were found.

Trooper Robert Hathaway, from the state police forensic laboratory, testified that the defendant's rifle could be fired accidentally, but only if: (1) the rifle had a cartridge in the chamber; (2) the safety lever was compressed against the barrel; (3) the hammer was held back; and (4) the trigger was pulled—all while the hammer simultaneously slipped. Two defense witnesses testified that the defendant was familiar with gun safety.

Numerous witnesses for the state testified about a history of marital strife and documented the defendant's mental and physical abuse of the victim. Sergeant Robert Flannigan testified that he had been called to the defendant's residence to investigate a domestic dispute less than two weeks before the victim's death. The victim, who had a cut and bruised lip, had urged Flannigan to remove the "30-30" caliber Winchester rifle from their home. During the state's case-in-chief, several witnesses testified that the victim had been terrified of guns.

Attorney David Fabricant testified that on June 1, 1989, two days before the shooting, the victim had consulted him, saying that she had been a victim of abuse by her husband. Fabricant testified that he had noticed bruises on her legs, arms and neck. He testified that the victim had told him that she was afraid that if she divorced her husband, he would attempt to obtain custody of their young child. Other witnesses attested to having seen bruises on the victim which she said had been inflicted by the defendant. The victim's mother

testified that the victim had said, " 'Mom, [the defendant] told me that he was going to have his child if he had to kill me to do it.' "

## I

The defendant claims that the trial court improperly denied his motion for judgment of acquittal because the state did not produce sufficient evidence to establish beyond a reasonable doubt that the defendant intended to kill his wife. The defendant asserts that (1) in light of his intoxication, a reasonable jury could not have concluded beyond a reasonable doubt that he intended to kill his wife, and (2) he acted under the influence of extreme emotional disturbance, thereby mitigating his culpability from murder to manslaughter. The defendant does not dispute the fact that he caused the victim's death, but challenges the sufficiency of the evidence that he possessed the requisite intent to kill his wife. We are not persuaded by either of the defendant's sufficiency claims and conclude that the trial court properly denied the defendant's motion for a judgment of acquittal.

In reviewing a sufficiency claim, this court must follow the well established two-part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." *State* v. *Grant,* 219 Conn. 596, 599–600, 594 A.2d 459 (1991). Moreover, circumstantial evidence has the same probative force as direct evidence. Id., 600.

## A

The defendant claims that in light of the evidence of his intoxication, a reasonable jury could not have found

beyond a reasonable doubt that he specifically intended to kill his wife. "A criminal defendant's intoxication is relevant to the determination of his capacity to form a specific intent to commit a crime." *State* v. *Vinal,* 198 Conn. 644, 658, 504 A.2d 1364 (1986); *State* v. *D'Antuono,* 186 Conn. 414, 423, 441 A.2d 846 (1982). Intoxication, however, does not automatically negate intent. *State* v. *Vinal,* supra. In this case, the trial judge charged the jury as follows: "Intoxication shall not be a defense to a criminal charge. But in any prosecution for an offense, evidence of intoxication of [a] defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged . . . ." " '[I]ntoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body." General Statutes § 53a-7. "It is for the jury to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime with which he is charged. See *State* v. *Smith,* 185 Conn. 63, 70 n.7, 441 A.2d 84 (1981)." *State* v. *Vinal,* supra, 659.

Testimony at the defendant's trial established that both the defendant and the victim had been heavy drinkers and that the defendant was under the influence of alcohol when he was arrested. At the same time, the officer who administered the blood alcohol test testified that the defendant had no difficulty relating events, that he had been alert and had no difficulty understanding what was going on at the police station. The defendant's speech was not slurred, and he did not have any difficulty walking. In light of this evidence, it was entirely reasonable for the jury to conclude beyond a reasonable doubt that the defendant's intoxication did not prevent him from forming the necessary intent to kill his wife.

## B

The defendant also claims that the trial court erred in denying his motion for judgment of acquittal because he proved by a preponderance of the evidence that he was acting under the influence of extreme emotional disturbance. Extreme emotional disturbance is a mitigating circumstance that will reduce the crime of murder to manslaughter. *State* v. *Asherman,* 193 Conn. 695, 731, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The burden is on the defendant to prove extreme emotional disturbance, which is an affirmative defense, by a preponderance of the evidence.[6] Id.; *State* v. *D'Antuono,* supra, 420.

In the present case, the defendant did not introduce any expert testimony to establish that he was under the influence of extreme emotional disturbance when he committed the crime. The defendant asserts that despite the lack of psychiatric testimony at trial, the evidence of marital breakdown was sufficient to support the reduction of the murder charge to the mitigated lesser offense of manslaughter in the first degree because of extreme emotional disturbance. It is true that the evidence adduced at trial described a failing and miserable marriage. Most of the evidence, however, pointed to the defendant's mental and physical abuse of the victim, rather than to distress or anguish on the part of the defendant. Testimony also established that the defendant was angry the day and evening before the shooting and that he was upset after the shooting occurred. The jury also heard evidence, however, that while the defendant was at the police station, after the shooting, his mood varied from upset and emotional, to somber and serious, to telling jokes.

---

[6] The defendant does not claim error in the trial court's charge to the jury on the issue of extreme emotional disturbance.

In light of these circumstances, a reasonable jury could have concluded that the defendant had not proved by a preponderance of the evidence that he acted under the influence of extreme emotional disturbance when he killed his wife.

## II

The defendant next claims that the trial court erred by denying his motion for a mistrial following the testimony of Karen Bickel, a friend and neighbor of the victim. On direct examination, Bickel testified that on May 19, 1989, she had heard the defendant tell the victim that he was going to kill her. She also testified that on Friday, June 2, 1989, the victim had shown her the bruises on her body from the defendant and had told Bickel that she had been to see a lawyer. Bickel testified that during their conversation, the victim screamed when she spotted the defendant's face pushed up against the screen of the open window. On cross-examination, Bickel testified that the defendant had looked angry on June 2. During redirect examination by the state's attorney, Bickel testified that the defendant had appeared to be angry because "[w]hen he called me and I went to his house, he attacked me." Defense counsel immediately objected, moved to strike and moved for a mistrial. The court denied the defendant's motion for a mistrial, but agreed to strike the witness' response and instructed the jury as follows: "The answer to that last question was not responsive to the questions. And it's—in any event, at this point, the information that was provided was immaterial and irrelevant and shouldn't enter into any part of your deliberation. You're to erase it from your minds and not consider it any part of your deliberations." The defendant claims that Bickel's testimony was highly prejudicial and inflammatory because it related to the

central issue in the case—whether the defendant intended to kill his wife—and because it related to an event that occurred close in time to the shooting.

"[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated." (Internal quotation marks omitted.) *State* v. *Weinberg,* 215 Conn. 231, 250, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). On appeal, the defendant bears the burden of establishing that the occurrence was so prejudicial, in the context of the trial as a whole, that it denied him a fair trial. *State* v. *Cruz,* 212 Conn. 351, 365, 562 A.2d 1071 (1989). The decision to grant or deny a motion for a mistrial is within the sound discretion of the trial court. *State* v. *Marra,* 215 Conn. 716, 731–32, 579 A.2d 9 (1990); *State* v. *Hill,* 201 Conn. 505, 510, 523 A.2d 1252 (1986); *State* v. *Gaston,* 198 Conn. 490, 496, 503 A.2d 1157 (1986). While this discretion can be abused, such is not the case here.

Although Bickel's testimony about the events leading up to the shooting played an important role in the state's case, her testimony was corroborated by other witnesses. The victim's mother testified that the victim had said that the defendant had threatened to kill her. Numerous witnesses testified having seen bruises on the victim which she said had come from the defendant. Melissa Post, a friend of the victim, testified that the defendant had said that he and the victim were getting divorced. The defendant's sister also testified that the defendant had said that he and the victim were divorcing.

The trial court was in the best position to determine whether Bickel's statement that the defendant had attacked her was so prejudicial, in light of the entire

proceedings and testimony by other witnesses, that it deprived the defendant of a fair trial. Here, the jury was presented with substantial evidence, apart from Bickel's testimony, of the defendant's abusive behavior and of his intent to kill his wife. The trial court promptly struck the witness' response, immediately admonished the jurors to "erase it from your minds" and told them not to consider the statement in their deliberations. The trial court, in its final charge, instructed the jury not to consider any evidence that had been stricken. Under these circumstances, we are not persuaded by the defendant's claim that Bickel's statement so prejudiced him that it denied him a fair trial. The trial court properly denied the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.