STATE OF CONNECTICUT *v.* RAYSEAN WILLIAMS
(AC 19362)

Mihalakos, Zarella and Dupont, Js.

Argued November 30, 2000—officially released July 31, 2001

*Jeremiah Donovan*, with whom, on the brief, was *Rita Christopher*, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom were *Terence Mariani*, assistant state's attorney, and, on the brief, *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. On November 18, 1998, the defendant, Raysean Williams, was charged in a six count substitute information with the following crimes: (1) count one, possession of a narcotic substance (cocaine) with the intent to sell in violation of General Statutes § 21a-278 (a); (2) count two, possession of a narcotic substance (cocaine) with the intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b); (3) count three, possession of a controlled substance (marijuana) with the intent to sell in violation of General Statutes § 21a-277 (b); (4) count four, possession of a controlled substance (marijuana) with the intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b); (5) count five, possession of four ounces or more of a cannabis-type substance (marijuana) in violation of General Statutes § 21a-279 (b); and (6) count six, possession of four ounces or more of a cannabis-type substance (marijuana) within 1500 feet of a school in violation of General Statutes § 21a-279 (d). A jury trial ensued, and it resulted in a verdict of guilty on counts one and two, and not guilty on the remaining counts. The trial court

rendered judgment in accordance with the jury verdict. After the defendant was sentenced, he appealed.

On appeal, the defendant claims that (1) his conviction was not supported by sufficient evidence, (2) the search warrant for his apartment was invalid, and the court, therefore, improperly admitted incriminating evidence that the police had seized pursuant to the warrant, (3) the court abused its discretion when it did not permit him to dismiss his court-appointed attorney and proceed pro se, (4) the court improperly permitted a police detective to testify from memory regarding the defendant's driver's license after concluding at a suppression hearing that the seizure of the driver's license violated the defendant's constitutional rights, and (5) the court abused its discretion when it denied his motion for a mistrial. We affirm the judgment of the trial court.

The record discloses the following facts. At approximately 11 a.m. on August 22, 1997, officers and detectives from the Waterbury police department (officers) traveled to the defendant's second floor apartment at 10 Webb Street, Waterbury, to execute a search warrant. After knocking on the defendant's door and receiving no response, the officers opened the door, which was unlocked, and entered the living room. Seeing no occupants there, they proceeded to the defendant's bedroom, where they found the defendant and his girlfriend, Kristy Chevarella. The defendant and Chevarella were detained.

The officers searched the defendant's apartment and found the following items: (1) one large plastic bag containing sixty-one small plastic bags, each of which contained a white, rock-like substance (cocaine, total of eight and one-half grams); (2) one "Mobile Comm beeper"; (3) one "ready beeper"; (4) one envelope containing $1700; (5) thirty live rounds of .357 caliber

ammunition; (6) five live rounds of .38 caliber ammunition; (7) one plastic bag containing one razor blade and numerous unused plastic bags; (8) one Connecticut driver's license that listed "Ray S. Williams" as the licensed operator; and (9) one Connecticut nondriver identification card that belonged to Chevarella.

The officers also searched the basement of the defendant's apartment building. There, they found the following items: (1) one Ruger .357 caliber pistol containing one live round in its chamber and nine live rounds in its clip; (2) one Glock nine millimeter pistol containing one live round in its chamber and nine live rounds in its clip; (3) three clips of ammunition containing a total of seven live rounds of .45 caliber ammunition and fifteen live rounds of .357 caliber ammunition; (4) one box containing forty-eight live rounds of .38 caliber ammunition; (5) one brown paper bag that contained one razor blade and numerous unused plastic bags; and (6) one plastic bag containing 3.78 ounces of a plant-like substance (marijuana). The officers thereafter arrested the defendant.

I

The defendant first claims that his conviction was not supported by sufficient evidence and, therefore, the court improperly denied his motion for a judgment of acquittal. Specifically, the defendant argues that the evidence was insufficient to support a finding that he had exercised dominion and control over the cocaine seized from his apartment, and that he had the intent to exercise such dominion and control.[1] We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. Daryll Dublin, a Waterbury police officer, testified that he and his wife

---

[1] The defendant makes no argument that the evidence was insufficient to support that portion of count two that requires an intent to sell within 1500 feet of a school.

owned the two-family house in which the search was executed. Dublin testified that the house had two floors and a basement, and that each of the two floors was rented as an apartment. Dublin further testified as follows. On August 22, 1997, the date the search was executed, the defendant and Chevarella lived in the apartment on the second floor. The defendant also used the basement to house his pit bull, and he paid Dublin an additional $50 per month in rent for the privilege of keeping the dog there. On several occasions, Dublin observed that the defendant was keeping the pit bull caged in the basement, which could not be accessed from inside either of the apartments. An exterior door provided the only access to the basement.

Nicholas DeMatteis, a Waterbury police detective, testified that he assisted in searching the defendant's apartment, and that while searching the bedroom he "found a plastic bag with a razor blade and numerous unused, small ziplock bags" in a nightstand. DeMatteis further testified that in the same nightstand he found a Connecticut driver's license. He testified that the name on the license was "Ray Williams," and that the license photograph was of the male that he and the other police officers had found in the bedroom while executing the search warrant. DeMatteis identified that male as the defendant.

Fred Spagnolo, another Waterbury police detective, testified that he assisted in searching the defendant's apartment. Spagnolo testified that while searching the defendant's bedroom, he discovered sixty-one plastic bags, each of which contained a white, rock-like substance.[2] Spagnolo further testified that (1) "[r]azor blades are used to cut up the narcotics to package them for street sale," (2) "[s]ometimes narcotics dealers will—will keep dogs for—again for protection against

---

[2] That substance later was determined to be cocaine.

someone attempting to steal their drugs and their money," and (3) "[c]ommonly . . . narcotics dealers do carry weapons to protect their drugs, their money and sometimes themselves from other narcotics dealers who would want to sell narcotics in their area."

Timothy Kluntz, a Waterbury patrolman, testified that he assisted in searching the defendant's apartment. Kluntz testified that while searching the dresser in the defendant's bedroom, he found thirty live rounds of .357 caliber ammunition and five live rounds of .38 caliber ammunition.

Harold Setzer, another Waterbury patrolman, testified that he was in charge of searching the basement. Setzer testified that Dublin arrived and provided him with a key, which he used to access the basement. Setzer further testified as follows. While searching the basement, he found "small ziplock bags." Bags of that type are called "apple bags," and "[t]hey're used to package crack cocaine for street sales." In the basement, Setzer also found .38 caliber ammunition and a loaded .357 caliber Ruger handgun.

"In reviewing a sufficiency of the evidence claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possi-

ble doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 224–25, 733 A.2d 156 (1999).

"In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where, as here, the cocaine was not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Citations omitted; internal quotation marks omitted.) Id., 225.

In the present case, it is undisputed that the defendant and Chevarella shared possession of the second floor apartment. Consequently, the jury could not have reasonably concluded that the defendant had constructively possessed the cocaine, namely, that he had known of the presence of the cocaine and had control over it, "unless there [were] other incriminating statements or

circumstances tending to buttress such an inference." (Internal quotation marks omitted.) Id.

We conclude that there were other incriminating circumstances that tended to establish that the defendant had constructively possessed the cocaine. The defendant housed his pit bull in the basement, where the apple bags and the guns were found. Also, many unused, small ziplock bags ("apple bags") were found in the defendant's nightstand drawer, along with razor blades and his driver's license. Bullets for the guns that were found in the basement were discovered in the defendant's dresser drawer. Construing that evidence in the light most favorable to sustaining the verdict, the jury reasonably could have found that the defendant had placed the apple bags and the guns in the basement. Such a finding would tend to buttress an inference by the jury that the defendant knew of, and had control over, the identical or related items found in his bedroom, i.e., the apple bags, the razor blades, the bullets and the sixty-one apple bags of cocaine. Accordingly, we conclude that the evidence was adequate to support a finding that the defendant had constructively possessed the cocaine that was found in his apartment. Therefore, the court properly denied the defendant's motion for a judgment of acquittal.

## II

The defendant also claims that his rights under the fourth amendment to the United States constitution were violated when the search warrant for his apartment was executed, and the court improperly admitted at trial incriminating evidence that had been seized pursuant to the warrant.[3] Specifically, the defendant

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

claims that the warrant affidavit did not establish probable cause to search his apartment.

The following facts are relevant to our resolution of the defendant's claim. The affidavit supporting the application for the search warrant states in relevant part: "That the affiants Lt. Michael Ricci and Det. Nicholas DeMatteis are both regular members of the Waterbury police department having 46 years of police training and experience. Aforementioned are presently assigned to the investigative divisions of the Waterbury police department and have conducted numerous investigations involving narcotics that have led to arrests and convictions.

"That within the past 2 days the affiants received information from *a known reliable and confidential informant who in the past has supplied information that has led to several arrests and convictions.* Said [confidential informant] stated that *while in the apartment* of Rayshawn Williams a large amount of crack cocaine packaged for street sale was observed. [The confidential informant] stated that Mr. Williams lives on the second floor of 12 Webb Street Waterbury Conn.[4]

"That a check with the records division of the Waterbury Police Department [shows] that a Rayshawn Williams *has been arrested for poss. of ½ gram or more of cocaine in [freebase] form and was convicted of said*

---

Although the defendant also refers in his principal brief to a violation of his rights under article first, § 7, of the constitution of Connecticut, he has failed to provide an independent analysis of the state constitutional issues. See *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992) (setting forth appropriate factors to be addressed when raising state constitutional claim). Consequently, we conclude that the defendant has abandoned this state constitutional claim. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

[4] The address of the first floor apartment in the defendant's apartment building is 12 Webb Street, and the address of the second floor apartment, in which the defendant lived, is 10 Webb Street. Twelve was the only number, however, on the outside of the defendant's apartment building.

*charge*, court sentence was 3 yrs. [execution suspended after] 18 months 3 years probation. Mr. Williams was also convicted on assault weapons charges. Mr. Williams is also known as Ray Williams D.O.B. 02-25-72.

"That the affiants know from training and experience that drug traffickers keep on hand narcotic packaging materials, safes, scales, safety deposit box keys, strongboxes, cash and weapons.

"That based on the above mentioned facts the affiants feel that probable cause has been established to believe that Rayshawn 'Ray' Williams is using his apartment at 12 Webb Street Waterbury Conn. second floor to stash and sell narcotics from. The affiants respectfully request a search and seizure warrant for said apartment and for the person of Rayshawn 'Ray' Williams D.O.B. 02-25-72." (Emphasis added.)

The defendant did not preserve his claim at trial and now requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if all of the following conditions are met: '(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' Id. 'The first two requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail.' *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). This court, however, is free to dispose of a *Golding* claim by focusing on the condition that appears most relevant under the circum-

stances of the case. *State* v. *Pinnock*, 220 Conn. 765, 778, 601 A.2d 521 (1992)." *State* v. *Eaton*, 59 Conn. App. 252, 269, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000). Our analysis focuses on the third prong of *Golding.*

In the present case, the search warrant affidavit was based, in large part, on information supplied to the police by a confidential informant. "We view the information in the affidavit in the light most favorable to upholding the magistrate's determination of probable cause. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination." (Citation omitted; internal quotation marks omitted.) *State* v. *Vincent*, 229 Conn. 164, 172, 640 A.2d 94 (1994).

"An appropriate starting point is the two-pronged test derived from the United States Supreme Court's decisions in *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The *Aguilar-Spinelli* test, as it is commonly known, provided a method for evaluating the existence of probable cause when an arrest or search warrant affidavit was based upon information supplied to the police by a confidential informant. Under the *Aguilar-Spinelli* test, the trial court was required to make two determinations: (1) whether the informant's veracity or reliability was established; and (2) whether there was a basis for the informant's knowledge regarding the information supplied." *State* v. *Velasco*, 248 Conn. 183, 190, 728 A.2d 493 (1999). Our Supreme Court recently confirmed that evidence satisfying the requirements of the *Aguilar-Spinelli* test necessarily satisfies the requirements of probable cause. See id., 193.[5]

---

[5] We note that although the United States Supreme Court in *Illinois* v. *Gates*, 462 U.S. 213, 236–38, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), abandoned the *Aguilar-Spinelli* test, but not its underlying concerns, and adopted

In the present case, the affidavit stated that a "known reliable and confidential informant who in the past has supplied information that has led to several arrests and convictions" saw a "large amount of crack cocaine packaged for street sale" in the defendant's second floor apartment, which was located at 12 Webb Street in Waterbury. It also stated that the defendant previously had been convicted of possessing cocaine. When viewed in the light most favorable to upholding the determination that probable cause existed for the search, the allegations (1) that the confidential informant's tips had led to convictions in the past and (2) that the defendant previously had been convicted for possession of cocaine establish that the information was reliable, thereby satisfying the first prong of the *Aguilar-Spinelli* test. See *United States* v. *Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) ("[i]t is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant"); *State* v. *Ferguson*, 185 Conn. 104, 115, 440 A.2d 841 (1981) ("factor which we have relied upon to determine the reliability of information provided by an informant is the reputation or past criminal behavior of the suspect"); *State* v. *Velasco*, 47 Conn. App. 424, 433, 707 A.2d 286 (1998) (information supplied by known informant whose tips had led to past convictions did not need to be corroborated to establish probable cause), aff'd, 248 Conn. 183, 728 A.2d 493 (1999); *State* v. *Torres*, 36 Conn. App. 488, 497, 651 A.2d 1327 ("[i]f an informant has a track record of providing reliable

instead a totality of the circumstances approach, which our Supreme Court thereafter adopted in *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991) (en banc), the quantum of evidence that is necessary to establish probable cause remains consistent regardless of whether a court applies the *Aguilar-Spinelli* test or the totality of the circumstances approach. *State* v. *Velasco*, supra, 248 Conn. 192–93. Therefore, evidence that satisfies the *Aguilar-Spinelli* test "necessarily satisfies the requirements of probable cause under the more inclusive totality of circumstances approach." Id., 193.

information, the issuing judge may credit the information given in a warrant application"), cert. denied, 232 Conn. 912, 654 A.2d 357 (1995).

Similarly, the officers' allegation in the warrant affidavit that the confidential informant had seen cocaine in the defendant's apartment, when viewed in the light most favorable to upholding the determination of probable cause, establishes that there was a basis of knowledge for the information, thereby satisfying the second prong of the *Aguilar-Spinelli* test. See *State* v. *Torres*, supra, 36 Conn. App. 497 (informant's personal observation of events set forth in affidavit satisfies basis of knowledge requirement). Therefore, it appears that the affidavit underlying the search warrant for the defendant's second floor apartment did establish probable cause. See *State* v. *Velasco*, supra, 248 Conn. 193.

Accordingly, we conclude that the defendant has failed to satisfy the third prong of *Golding* because he has not demonstrated that the alleged violation of his rights under the fourth amendment clearly exists. Consequently, the defendant cannot prevail on his unpreserved claim.

### III

The defendant also claims that the court abused its discretion in declining to permit him to dismiss his court-appointed attorney and to proceed pro se. Additionally, the defendant claims that the court failed to inquire adequately into the basis for his request. We are not persuaded.

The following facts are relevant to our resolution of the defendant's claim. The defendant expressed dissatisfaction with his attorney on two occasions: (1) on December 4, 1998, during the hearing on the defendant's motion to suppress; and (2) on December 7, 1998, the first day of evidence, before the jury was called into

the courtroom and sworn in. On the first occasion, the defendant told the court that he was unhappy because his attorney had not called witnesses to testify that he had not been living in the second floor apartment when the police searched it.[6] On the second occasion, which is of greater significance, the defendant expressed concern because his attorney had not yet argued that the guns that the police had found were not his. The following colloquy in relevant part occurred between the court, the defense counsel, the prosecutor and the defendant on December 7, 1998:

"[Defense Counsel:] Your Honor, I'd also like to be heard. My client is very concerned that I'm not capable of properly representing him. . . .

"The Defendant: That's true, Your Honor, because right then and there the—the guns was registered to a—a person that—that lived in the house, but she didn't—she didn't say that. You know what I'm saying? How is it gonna be my gun when it's—it's registered. I gave her papers that it's her guns. You know what I'm trying to say, Your Honor? How—How is it mine if it's registered to somebody that lives in the house?

"The Court: Well, that's—That's a matter of fact for the jury to find. I—I know of no reason—

[6] During the suppression hearing, the following colloquy in relevant part occurred between the court and the defendant:

"The Court: Raysean Williams, a motion to suppress. Court is back in session. Okay. . . . [F]irst, Mr. Williams, [the defense counsel] says you're not happy with her.

"The Defendant: That's true, Your Honor.

"The Court: Why?

"The Defendant: Because she never call no witnesses or never subpoenaed a witness and a lot of stuff like the address, people that live at this address.

"The Court: We're going to deal with that now. The thing is, I assume at the trial she's going to call your mother and girlfriend to testify as to where you were. She says that you were living on the first floor and not the second floor, and that's the issue as far as that's concerned."

"The Defendant: Well, is she gonna bring this up in front of the jury, Your Honor?

"The Court: Well, I have no idea.

"The Defendant: So can I fire her, Your Honor? I mean, I—This is—this is—I don't got no money for a lawyer. Give me a month to get the money for a lawyer that's gonna come in here and do this thing. I mean represent me to the best and fullest.

"I feel that—I'm feeling hurt right now because she's not representing me right. He—He—He—He investigated everything—the prosecutor did—investigated everything.

"Where's my witnesses at? And where's the person I live—the—the person that lives in the house, where's they at? This is—This is—This is—This is ridiculous. Because I don't got no money, I—I'm gonna go to jail for twenty years? This is—This is not right to me.

"[Assistant State's Attorney:] Judge, I—I could put one thing on the record.

"The Court: Go ahead.

"[Assistant State's Attorney:] This—This person who supposedly was the purchaser of the gun, our office made contact with that person. She said that the gun was stolen out of her house years ago and she has no idea how it ended up in the defendant's basement. Just on that issue.

"The Defendant: Well, why didn't she report it stolen, Your Honor?

"The Court: I—I really don't know, but we have sixteen jurors upstairs that are ready to proceed. Your counsel, sir, has tried cases in front of me before. She's a competent counsel. I see no exceptional circumstances

here that would cause me to do anything except proceed with the case today.

\* \* \*

"The Defendant: *Can I say something, Your Honor? Can I say something? Can I defend myself?*

"The Court: Pardon me?

"The Defendant: *Can I defend myself?* . . .

"The Court: Why would you want to do that?

"The Defendant: Because I know more facts about this case than anyone knows about it.

"The Court: You don't know anything about the law.

"The Defendant: And I want the jury—yeah. That's right. That's true. But I know that this—this case is way bigger than they—they trying to tell me. This is not only about me. This is about the—the cop that they gonna try to bring in here that has a drug offense, was a drug user, his house, that he was probably messing with this woman that they never arrested in this house.

"It's totally a mistake, Your Honor. And—and—and she's not gonna bring this up. This is twenty years of my life probably I'm gonna get. You know what I'm trying to say? I'll take the twenty years if you can prove—if—if the case is gonna be presented right, if my lawyer gonna defend me the—

"The Court: Well, we're gonna find that out right now.

"The Defendant:—way she's supposed to defend me.

"The Court: That—That's enough. We'll just let the jury come in and listen to the case and we'll see what happens. Bring them in, please." (Emphasis added.)

Thereafter, the defendant neither raised an objection concerning the adequacy of his representation nor indi-

cated that he wanted to dismiss his attorney and represent himself.

"There is no doubt that a defendant has a right under both the state and the federal constitutions to represent himself at his criminal trial."[7] *State* v. *Carter*, 200 Conn. 607, 611, 513 A.2d 47 (1986); see Practice Book § 44-3.[8] "The constitutional right of self-representation depends, however, upon its invocation by the defendant in a clear and unequivocal manner." *State* v. *Carter*, supra, 612. "In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself, because the right of self-representation, unlike the right to counsel, is not a critical aspect of a fair trial, but instead affords protection to the defendant's interest in personal auton-

---

[7] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

[8] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

omy." Id., 613. "When a defendant's assertion of the right to self-representation is not clear and unequivocal, recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court." Id., 613–14. "In the exercise of that discretion, the trial court must weigh into the balance its obligation to indulge in every reasonable presumption against waiver of the right to counsel." (Internal quotation marks omitted.) Id., 614.

The previously discussed and italicized portion of the December 7, 1998 hearing transcript indicates that the defendant was aware of the right to self-representation, and was asking for permission to speak and to proceed pro se.[9] The record also demonstrates that the defendant had expressed dissatisfaction with his attorney on two occasions.[10] The defendant's expressions of dissatisfaction are not determinative, however. See id., 611–14. First, the defendant cannot succeed in his claim that the court failed to inquire adequately into his interest in representing himself unless the court was required to make such an inquiry. A court is required to do so only when the defendant clearly and unequivocally asserts

[9] As previously indicated, the defendant asked the court: "Can I say something, Your Honor? Can I say something? Can I defend myself? . . . Can I defend myself?" When considered contextually, the defendant's use of the verb "can" urges us to conclude that he was not asking if the courts had recognized a right to self-representation, but was asking for permission to speak, to dismiss his attorney and to proceed pro se. See Merriam-Webster's Collegiate Dictionary (10th Ed. 1999) ("use of *can* to ask or grant permission has been common since the 19th century and is well established, although some commentators feel *may* is more appropriate in formal contexts" [emphasis in original]).

[10] The record further demonstrates that the defendant's dissatisfaction on both occasions was encouraged by his "misconception of the normal sequence of the presentation of evidence by the state and the defendant." *State* v. *Carter*, supra, 200 Conn. 614. It would have been premature for defense counsel either (1) to call the witnesses during the suppression hearing as the defendant had wanted or (2) to raise the argument about the guns before the evidentiary phase of the trial began, because, as the court intimated, the evidence and arguments in both instances concerned factual issues that were for the jury to decide.

the right to self-representation. See id., 613. We have reviewed the record, and we conclude that the defendant never clearly and unequivocally *asserted* that right.[11] See also *Burton* v. *Collins*, 937 F.2d 131, 133–34 (5th Cir. 1991) (defendant did not clearly, unequivocally assert right to self-representation when, in spontaneous response to trial court's denial of request for new counsel, he asked, "May I represent myself?"). Consequently, the court was not required to inquire into the defendant's interest in representing himself.

Second, under the circumstances, whether the defendant invoked his right to represent himself is "a matter entrusted to the exercise of discretion by the trial court." *State* v. *Carter*, supra, 200 Conn. 614. The defendant's acquiescence in the continuation of the trial with his court-appointed attorney demonstrates that the court did not abuse its discretion. See id., 614–15. Accordingly, we conclude that the court properly declined to permit the defendant to proceed pro se.

IV

The defendant also claims that the court improperly permitted a police detective to testify from memory about a driver's license he had found while searching a nightstand in the defendant's bedroom. The defendant argues that because the court had concluded at a suppression hearing that the seizure of the driver's license violated the defendant's rights under the fourth amendment,[12] the court was required under the fourth amendment to exclude the detective's testimony about the license. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. On July 23, 1998,

---

[11] In this context, "assert" means "to state or declare positively and often forcefully or aggressively." Merriam-Webster's Collegiate Dictionary (10th Ed. 1999).

[12] See footnote 3.

the defendant filed a motion to suppress[13] in which he argued, inter alia, that the state should not be permitted to introduce into evidence the driver's license that the officers found in the defendant's apartment. The defendant argued that the license should be suppressed because it did not match the description of any of the items listed in the search warrant.[14]

On December 4, 1998, the court conducted a hearing on the defendant's motion to suppress. It ruled that the state could not introduce the license into evidence because it was "not enumerated in the search warrant." The court reserved ruling, however, on whether the police detective who seized the license could testify from memory about the license.[15]

On December 7, 1998, the first day of evidence, the defendant urged the court to preclude DeMatteis, the police detective who found the driver's license, from testifying about it from memory. The court denied the defendant's request, stating: "I'll allow him to testify as to what he saw regarding a license. He had a license and right to be where he was, and anything he saw he could obviously report." Immediately thereafter, the state resumed its direct examination of DeMatteis and elicited the following testimony about the driver's license:

"[Assistant State's Attorney:] When we left off, I believe you were testifying about what you had found in the nightstand.

---

[13] Practice Book § 41-12 provides: "Upon motion, the judicial authority shall suppress potential testimony or other evidence if it finds that suppression is required under the constitution or laws of the United States or the state of Connecticut."

[14] The search warrant authorized the seizure of "[c]ocaine derivative 'crack,' monies, guns, narcotics records-ledgers, drug paraphernalia, safes and strong boxes, powder cocaine."

[15] In so doing, the court, *Damiani, J.*, stated: "I'm just ruling that the physical documents can't go into evidence. Judge Gill will rule as to whether or not [the police officer who seized the license] can testify from memory. In my opinion, [he] can. I will let Judge Gill give the final ruling."

"[The Witness:] Correct.

"[Assistant State's Attorney:] The beeper, the bags with the razor, and what else did you find in the nightstand?

"[The Witness:] Two forms of identification.

"[Assistant State's Attorney:] And what where they?

"[The Witness:] One was a state of Connecticut ID in the name of Kristy Chevarella, and the second one was a driver—Connecticut driver's license in the name of—I think it was Ray Williams.

"[Assistant State's Attorney:] And did you have occasion to look at the picture that was on the driver's license?

"[The Witness:] I did.

"[Assistant State's Attorney:] And did you have occasion to see the people that were being detained in the apartment that day?

"[The Witness:] I did.

"[Assistant State's Attorney:] And were those people one in the same?

"[The Witness:] Correct.

"[Assistant State's Attorney:] And do you recognize that person in the courtroom?

"[The Witness:] Yes, I do.

"[Assistant State's Attorney:] Could you identify him, please?

"[The Witness:] The gentleman sitting next to [the defense counsel].

"[Assistant State's Attorney:] May the record reflect he's identified the defendant, please?

"The Court: May so indicate."

In this appeal, neither the defendant nor the state challenges the court's findings and conclusions that were made during the suppression hearing. Therefore, we assume that they were proper. During the suppression hearing, however, the court, *Damiani, J.*, reserved ruling on whether it would allow DeMatteis to testify from memory about the driver's license. Thus, when the court, *Gill, J.*, later allowed the testimony, it was making a ruling in connection with the defendant's motion to suppress. Therefore, we will review the defendant's claim as a challenge to a ruling made by the court in connection with a motion to suppress and not as a challenge to an evidentiary ruling.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998).

In the present case, the defendant essentially claims that when a law enforcement officer seizes an item in violation of a defendant's fourth amendment rights, the fourth amendment requires a court to preclude that law enforcement officer from testifying from memory about the item at the defendant's criminal trial. Our analysis reveals that, given the circumstances of the present case, the court's decision allowing DeMatteis to testify about the driver's license from memory only was proper.

"The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. . . . The 'plain-view' doctrine[16] is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. . . . A seizure of the article, however, would obviously invade the owner's possessory interest. . . . If 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches." (Citations omitted.) *Horton* v. *California*, 496 U.S. 128, 133–34, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

---

[16] "The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois* v. *Andreas*, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983).

"An example of the applicability of the 'plain-view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." (Internal quotation marks omitted.) *Horton* v. *California*, 496 U.S. 128, 135, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). "[O]bjects not named in the warrant, but found within an officer's plain view, may be seized if the . . . officers had a reasonable basis for believing that the seized evidence was reasonably related to the offense which formed the basis for the search warrant. . . . This doctrine is based upon the premise that the police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant or are otherwise entitled to be in a position to view the items seized." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 347, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

In the present case, the court concluded that DeMatteis' seizure of the driver's license violated the defendant's fourth amendment rights. The court also concluded, however, that it would allow DeMatteis to testify from memory about the driver's license because he had a "right to be where he was, and anything he saw he could obviously report." Implicit in the court's conclusion is that DeMatteis was operating within the parameters of the search warrant when he entered the defendant's bedroom and searched the nightstand therein that contained the driver's license. That assumption is proper, partially because the nightstand could have contained several of the items listed in the search warrant.[17] See *State* v. *Montgomery*, 254 Conn. 694, 704, 759 A.2d 995 (2000) ("[w]hen police search for an item, they are entitled to search any container that logically could hold the item sought"). Thus, while the officers were executing the search pursuant to the warrant, the defendant did not have a privacy interest in the contents of the nightstand, although he may well have retained a possessory interest in them, including the driver's license. See *State* v. *Eady*, 249 Conn. 431, 444, 733 A.2d 112 (" '[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy' "), cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

While DeMatteis was searching the nightstand, he was entitled to move the contents of its drawers in the course of searching for some of the items listed in the warrant. See *State* v. *Ruscoe*, 212 Conn. 223, 240–41, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). In so doing, DeMatteis also was entitled to conduct a cursory examination

---

[17] See footnote 14.

of the contents of the drawers to ascertain their identity. See *State* v. *Montgomery,* supra, 254 Conn. 707. Thus, DeMatteis was entitled to conduct a cursory examination of the driver's license when it came into view during his search of the nightstand. Such an examination would not have constituted an independent search because it would not have resulted in an additional invasion of the defendant's privacy interest. See *Arizona* v. *Hicks,* 480 U.S. 321, 325, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987).

At trial, when DeMatteis was questioned about the driver's license, he testified only that the operator's name was Ray Williams and that the license photograph resembled the defendant, who was one of two people found in the apartment. Thus, a central issue is whether, under the circumstances, DeMatteis, after conducting a lawful, cursory examination of the driver's license, could remember the operator's name and whether the license photograph resembled either of the people found in the apartment. That is a factual issue that was implicitly resolved against the defendant at the suppression hearing and at trial. See *State* v. *Ruscoe,* supra, 212 Conn. 241 ("[t]he defendant's further assertion that 'it was simply not reasonable for [the police detective] to have believed that the silver items might be located in a hollowed out appliance' is nothing more than a factual issue that was implicitly resolved against the defendant at the suppression hearing"). That factual finding is not clearly erroneous. Accordingly, we conclude that the defendant's rights under the fourth amendment were not violated when the court allowed DeMatteis to testify from memory about the driver's license, and his testimony did not convey knowledge that could not have been obtained through a lawful, cursory examination of the license.

## V

The defendant finally claims that the court abused its discretion when it denied his motion for a mistrial.[18] We disagree.

The following facts are relevant to our resolution of the defendant's claim. After the state completed its case-in-chief, the defendant called his mother, Forrestine Woods, as a witness. During direct examination, Woods described the living arrangements in the two-family house on Webb Street. She testified that she lived there with the defendant, two grandchildren and the defendant's girlfriend. During cross-examination, Woods testified that she, the defendant, the two grandchildren and the defendant's girlfriend all moved into the two-family house in 1996. The following cross-examination ensued:

"[Assistant State's Attorney:] So, it's your testimony that on May the first of 1996, [the defendant] came to live in that apartment?

"[The Witness:] Right.

"[Assistant State's Attorney:] Isn't it a fact that he wasn't around for quite some time then?

"[The Witness:] He was around then.

"[Assistant State's Attorney:] One moment, Judge. . . . And [the defendant] lived in that apartment continually from May the first, 1996, until he was arrested in August of 1997?

"[The Witness:] That's right.

---

[18] Practice Book § 42-43 provides in relevant part: "Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. . . ."

"[Assistant State's Attorney:] Do you recall him going to jail back in October of 1996?

"[Defense Counsel:] Objection.

"The Court: Sustained. Please ignore that, ladies and gentlemen. Discontinue this line of questioning, sir.

"[Assistant State's Attorney:] It goes to the credibility of the witness, Judge.

"The Court: Disregard that statement by counsel, please. It was inappropriate."

The next day, the defendant made an oral motion for a mistrial, arguing that the state's question concerning jail was "too prejudicial." The court denied the motion.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is in a better position than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 350–51, 696 A.2d 944 (1997); see Practice Book § 42-43.

In the present case, the court's curative instruction to the jury, which was given immediately after the state asked the objectionable question, sufficiently diminished any risk of prejudice to the defendant. Cf. *State v. Traficonda*, 223 Conn. 273, 283, 612 A.2d 45 (1992) (upholding denial of motion for mistrial where trial court, inter alia, "promptly struck the witness' response, immediately admonished the jurors to 'erase it from your minds' and told them not to consider the statement in their deliberations"). Thus, we are not persuaded that the defendant was denied a fair trial. Accordingly, we conclude that the court did not abuse its discretion when it denied the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other judges concurred.