# STATE OF CONNECTICUT *v.* AYISHEA DENSON
## (AC 20754)

Landau, Schaller and Mihalakos, Js.

Argued September 25, 2001—officially released January 29, 2002

*Reine C. Boyer*, for the appellant (defendant).

*James M. Ralls*, supervisory assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary W. Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Ayishea Denson, appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and (2).[1] On appeal, the defendant claims that (1) her conviction under subdivisions (1) and (2) of § 53a-59 (a) constitutes double jeopardy in violation of the fifth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut, (2) the prosecutor's closing argument deprived her of a fair trial, and (3) the court's instruction to the jury on reasonable doubt improperly diluted the state's burden of proof and deprived her of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Some years prior to September, 1998, the defendant was romantically involved with Jermaine Monk. In September, 1998, however, Monk married Nateysha Poindexter (victim). The defendant was distraught about the marriage and expressed her unhappiness in emotional outbursts. One night in October, 1998, the victim, her cousin Anitra Payne, and Shanel Highsmith went to a nightclub in New Haven. While the three were

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person . . . ."

standing near the dance floor, the defendant and some of her friends walked by and bumped the victim and Payne. Payne and the defendant exchanged angry words and were separated by club security personnel.

In 1998, the defendant was employed by Yale-New Haven Hospital, as were Dawn Poindexter, the victim's mother; Tracey Payne, the victim's cousin; and Theresa Oliver, the defendant's neighbor and a friend of the victim's grandmother. At the hospital on a day following the October nightclub incident, the defendant approached Poindexter, a person to whom she had never spoken. The defendant identified herself, referred to the nightclub incident and told Poindexter that she would "get" the victim.

The defendant's employment required her to deliver supplies and instruments to various floors of the hospital, which provided her with access to rooms where disposable scalpels were stored. Disposable scalpels come in a variety of colors, but most are green. During November, 1998, Oliver observed the defendant examining scalpels kept in a utility room. Oliver instructed the defendant to leave the scalpels alone. Later in the month, however, Oliver observed a disposable scalpel in the defendant's apartment. On another occasion, Oliver saw a green disposable scalpel in the defendant's handbag. The defendant told Oliver that she would "cut that bitch," referring to the victim.

Late in the evening of December 26, 1998, the victim, Highsmith and Anitra Payne again were in a New Haven nightclub where the defendant and her friends happened to be as well. Once more, the defendant and her friends bumped the victim and her friends. The victim telephoned Tracey Payne to come and mediate the situation because Tracey Payne worked with the defendant and knew some of her friends. At approximately 1:30 a.m. on December 27, 1998, the victim and her friends

left the club. Tracey Payne was outside waiting for them. The defendant and her friends left through another door and began to yell at the victim's group of friends. Angry words were exchanged, but Tracey Payne told the victim to keep walking. The defendant taunted and cursed the victim, and followed her as she walked toward her automobile. The defendant's friends urged the two to fight. When the victim reached the lot where her vehicle was parked, the defendant attacked her by swinging her hand at the victim's face. A witness noticed that the defendant was holding a green object. The defendant and the victim fell to the ground and continued to fight until a passerby pulled the victim away.

Police arrived on the scene and summoned medical assistance. The victim was bleeding from her face and neck. After the emergency medical personnel examined the victim, they requested that the ambulance that had been summoned arrive as quickly as possible. The victim was taken to the emergency room at Yale-New Haven Hospital, where she was evaluated as having major trauma due to the nature of her injuries, specifically, the lacerations to her neck and chest. The victim suffered two parallel lacerations diagonally from the upper portion of her neck across her chest to the right. Although the parallel lacerations across the victim's neck and chest varied in length and depth, they both had uniformly straight margins rather than jagged edges. That type of wound typically is made by a razor rather than a knife. Such an injury is consistent with those caused by a scalpel.

Due to the depth of the lacerations, the physicians who attended to the victim were concerned about the integrity of her airway, esophagus, carotid artery and jugular vein. The physicians ordered extensive tests to evaluate the extent of the victim's injuries. The victim also suffered multiple lacerations to her lip, face, wrist

and upper thigh. She underwent surgery to repair her wounds and was hospitalized for one and one-half days. She underwent a number of subsequent treatments, including cortisone injections and plastic surgery. As a result of the defendant's attack, the victim is scarred permanently.

When the defendant and the victim were separated, the defendant noticed that she had a cut on her little finger. After she was arrested, she was taken to the Hospital of St. Raphael, where she was treated and released. While she was being treated, Officer Philip McKnight of the New Haven police department interviewed her as part of his investigation. The defendant told McKnight that she was attacked but could not name her attackers. She also denied cutting the victim. The defendant was charged with multiple criminal violations.

During the summer of 1999, while she was in a local drugstore, Poindexter overheard the defendant identify her to a male companion as the mother of the girl "I cut." In November, 1999, the defendant was tried and convicted of assault in the first degree with intent to cause serious physical injury with a deadly weapon or dangerous instrument in violation of § 53a-59 (a) (1), and assault in the first degree with intent to disfigure another person seriously and permanently in violation of § 53a-59 (a) (2). The defendant appealed to this court.

I

The defendant first claims that her conviction of two counts of assault in the first degree pursuant to subdivisions (1) and (2) of § 53a-59 (a) constitutes double jeopardy in violation of the fifth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut.[2] The defendant con-

[2] "Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of article first, § 9, include protection against double jeopardy." *State* v. *Chicano*, 216 Conn.

cedes that she did not preserve her claim at trial. She may prevail on her claim only if she meets all four prongs of the test enunciated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] "[I]f double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable . . . ." *State* v. *Chicano*, 216 Conn. 699, 705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The defendant cannot prevail, however, because her claimed constitutional violation clearly did not exist and did not violate her right against double jeopardy. Her claim thus fails to satisfy the third prong of *Golding*.

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . *State* v. *Boucino*, 199 Conn. 207, 222, 506 A.2d 125 (1986). The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in

699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The defendant failed to provide a separate analysis of her state constitutional claim. See *State* v. *Alvarez*, 257 Conn. 782, 785 n.6, 778 A.2d 938 (2001). We therefore deem the claim abandoned. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999); *State* v. *Williams*, 64 Conn. App. 512, 520–21 n.3, 781 A.2d 325, cert. granted on other grounds, 258 Conn. 911, 782 A.2d 1251 (2001).

[3] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

*Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. Id., 304." (Internal quotation marks omitted.) *State* v. *Barber*, 64 Conn. App. 659, 672–73, 781 A.2d 464, cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001), citing *State* v. *Chicano*, supra, 216 Conn. 706–707. "In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Greco*, 216 Conn. 282, 291, 579 A.2d 84 (1990).

The state concedes, and we agree, that the defendant's double jeopardy claim arose out of the same act, the defendant's attack on the victim on December 27, 1998. Her claim fails the *Blockburger* test, however, because we conclude that each of the subdivisions of § 53a-59 (a) with which she was charged requires proof of a fact that the other does not.

The defendant argues that § 53a-59 (a) (2) is a lesser included offense of § 53a-59 (a) (1). "[I]f the two counts stand in the relationship of greater and lesser included offense, then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it." (Internal quotation marks omitted.) *State* v. *Goldson*, 178 Conn. 422, 425, 423 A.2d 114 (1979). To resolve the defendant's claim, we examine the language of the statutes. See *State* v. *Greco*, supra, 216 Conn. 290 ("issue, though essentially constitutional, becomes one of statutory construction").

Section 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury . . . he

causes such injury . . . by means of a *deadly weapon or a dangerous instrument*; or (2) with intent to disfigure another person *seriously and permanently . . . ."* (Emphasis added.) The defendant argues that one cannot commit assault with intent to cause serious physical injury with a dangerous instrument without first committing the offense of assault with intent to disfigure another. The defendant bases her argument on the definition of serious physical injury in General Statutes § 53a-3 (4), which provides that " '[s]erious physical injury' means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." She concludes that the element of permanency in § 53a-59 (a) (2) is linguistically identical to the element of serious loss in § 53a-3 (4). We do not agree.

When construing statutes, "we must start with the language employed by the legislature. . . . Generally, when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. . . . The words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed." (Citations omitted; internal quotation marks omitted.) *Lunn* v. *Cummings & Lockwood*, 56 Conn. App. 363, 371–72, 743 A.2d 653 (2000).

Using those rules of statutory construction, we conclude that subdivisions (1) and (2) of § 53a-59 (a) each set forth elements that the other does not. Only subdivision (1) requires that a person intend to cause *serious physical injury* by means of a *deadly weapon* or a *dangerous instrument*. Only subdivision (2) requires that a person intend to *disfigure* another *permanently*. The use of two different words indicates that the legislature intended to differentiate between the types of harm

a person can cause. It is entirely possible to cause serious physical injury without causing disfigurement or a permanent injury. The defendant provides no legal authority, and we know of none, for her proposition that the word permanent is linguistically identical to the term serious loss. Furthermore, the defendant's proposition flies in the face of the language used by the legislature in subdivision (2), which provides that a person must intend to disfigure "seriously *and* permanently." (Emphasis added.) General Statutes § 53a-59 (a) (2). By using the conjunction *and*, the legislature revealed its intention that *seriously* and *permanently* are two separate elements of the crime.

"The legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them. . . . In addition, the court must use common sense in construing statutes and must assume that a reasonable and rational result was intended by the promulgating legislature. . . . Further, we must presume that when the legislature uses different language, the legislature intends a different meaning of one statute from the other." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 32 Conn. App. 831, 840, 632 A.2d 50 (1993), appeal dismissed, 230 Conn. 347, 644 A.2d 911 (1994).[4]

Finally, this court has at least twice before concluded without a *Blockburger* analysis that *serious physical injury* does not require that the injury be permanent. *State* v. *Aponte*, 50 Conn. App. 114, 121, 718 A.2d 36 (1998), rev'd on other grounds, 249 Conn. 735, 738 A.2d

---

[4] "[T]he *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history. . . . Double jeopardy protection against cumulative punishments is only designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature." (Citations omitted; internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 292–93.

117 (1999), citing *State* v. *Rumore*, 28 Conn. App. 402, 415, 613 A.2d 1328, cert. denied, 224 Conn. 906, 615 A.2d 1049 (1992). The legislature is presumed to be aware of the interpretation that courts have placed on existing legislation. We presume that the legislature's failure to amend the statute in response to our interpretation is acquiescence in our interpretation. See *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 300, 777 A.2d 645 (2001) (*Zarella, J.*, concurring in part and dissenting in part).[5] The defendant's double jeopardy claim therefore must fail.

## II

The defendant's second claim is that the prosecutor's comments during closing argument deprived her of a fair trial. Specifically, the defendant claims that the prosecutor impermissibly commented on the credibility of the defendant and her witnesses, and on the defendant's right to remain silent. The defendant did not preserve her claim at trial and seeks to prevail on appeal pursuant to the *Golding* doctrine. We will review the defendant's claim because the record is adequate for our review and the claim is of constitutional magnitude. The defendant cannot prevail on her claim, however, because it fails to satisfy the third prong of *Golding*.

The following facts are relevant to our review of the defendant's claim. At trial, the defense theory was misidentification. The defendant testified in her defense that she did not slash the victim, but that she had a "pretty good idea" who did it. During cross-examination, the defendant admitted that although she had a "pretty good idea" who cut the victim, she never revealed the identity of that person to the police. The

---

[5] For a discussion of the development of General Statutes § 53a-59 (a) (2) from common-law mayhem, see *State* v. *Woods*, 25 Conn. App. 275, 278–80, 594 A.2d 481, cert. denied, 220 Conn. 923, 598 A.2d 365 (1991).

defendant and two defense witnesses also testified that they never gave statements to the police identifying who injured the victim. McKnight, who investigated the incident, testified that the defendant denied cutting the victim, but did not identify the perpetrator. None of the defendant's friends who were with her at the time of the altercation gave statements to the police, and none of the witnesses who testified on behalf of the defendant identified the person who injured the victim.

During his closing argument to the jury, the prosecutor asked the jury to consider the credibility of the defendant and two of her witnesses by commenting on their testimony. The prosecutor also argued that the defendant testified that she thought she knew who slashed the victim but did not reveal that person's name at trial.[6]

---

[6] The prosecutor argued in part: "I want to again comment on the issue of credibility of witnesses because it is important. Later . . . [the court] is going to give you some instructions about credibility of witnesses. Listen to those instructions carefully, particularly concerning the instructions concerning the defendant's credibility in this case. She is just like any other witness in this case. She's entitled to your due consideration and fair treatment. But you have to bear in mind she has a direct, very important interest in the outcome of this trial unlike any other witness in this case. And that's a consideration that you very well should take into consideration when you're determining what [the defendant] is.

"How else do you go about determining her credibility? Well, you know one of the things about credibility is . . . if the story remains the same, if it is consistent, you can say to yourself, well, she's being truthful. All of us have had experiences with young children. You ask them what happened, and suddenly they will tell you one thing and then five or ten minutes later, maybe the next day, suddenly they are telling you something else, and you can say to yourself, wait a second, are [they] trying to pull a fast one?

"Now, the inconsistent stories that she has given to you and the New Haven police are very telling. The night right after the incident, when she was talking with Officer McKnight at St. Raphael's, what does she say about the incident? I was attacked by a number of unknown assailants or unknown people. And yet when she gets on the witness stand, suddenly she's rattling off names. Oh, it was Anitra Payne, Tracey Payne, Shanel Highsmith, it was the victim, everyone was on me. Suddenly, she has her melee. I don't know how, but somehow, after eleven months, her memory suddenly has come back to her. And yet when Officer McKnight was at St. Raphael's Hospital

To determine whether the defendant's claim of prosecutorial misconduct clearly existed and deprived the defendant of a fair trial, "we must first decide whether the prosecutor's remarks were, in fact, improper, and, if so, whether they substantially prejudiced the defen-

that night and the defendant knew that she was under arrest for some serious assault charges, Officer McKnight asked her, and asked her more than once, 'Do you know who cut Nateysha Poindexter Monk?' I have no idea. It wasn't me. I have no idea. And yet when she got on the witness stand the other day, suddenly she says now, 'Well, I believe I know who it is.' We never find out who that was from her.

"Anyhow, does that make any sense? I mean, you're in the hospital, arrested for seriously cutting someone up, and the police ask you who did it; believe me, if you had any idea whatsoever who was responsible for that victim's injuries, that would have been the first thing out of your mouth. You would have said, look, you got the wrong person. I believe it is another person. You tell the police whatever information you had if you thought it was going to get you out of a difficult situation. You give the police that information so they can follow up, so they can investigate. The defendant never did that. No, she comes in here now, gets on the [witness] stand and wants you to believe, well, it is this person but I can't tell you, can't tell you who that is. She's a real stand-up person. She is going to take the weight for this thing and let this other person who she thinks was involved go.

"What about the defendant's sister and her good friend, Melissa Johnson. They both testified here during the course of the trial. You had an opportunity to see them and hear them. What that amounted to is two people, her sister and a good friend, trying to come in and help her out. Obviously, they are biased in her favor because one, as I said, is a sister and the other is a close friend. Ask yourselves, if you were either one of those two women, if you were a friend with the defendant or if you were her sister and you were out there that night in that parking lot, and you were out there while this assault was going on and you were out there after it finished, and you were out there when the New Haven police got there and you saw the police putting either your sister or your good friend in that police car, and you knew that she was under arrest for some serious assault charges, wouldn't you have said something to the police? Of course you would if you had helpful information and you were there and you knew that she didn't have anything to do with it; you would have said something immediately.

"Did either of those people ever go down to the New Haven police department at any point in time? Did they ever talk to any police officer? They didn't do that, either. What they did, is they come in at the last minute in a last-ditch attempt, here's our effort to try to help her out. It is kind of curious that they could take the time to come down here to court and be asked questions on the [witness] stand, but they couldn't take the time the night of the incident to talk to any New Haven police officer or they couldn't

dant. . . . In doing so, we have focused on several factors, [i]ncluded among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"We do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted. . . .

"Prosecutorial misconduct can occur in the course of closing argument. . . . Counsel, in addressing the jury, must be allowed a generous latitude in argument, including the zeal of counsel in the heat of argument. . . . Ultimately, the determination of the proper scope of closing argument lies within the sound discretion of the trial court. . . . We review the allegedly improper comments in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80, 90–91, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001).

"[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) Id., 93. Defense counsel's "failure to object to certain arguments at trial often is an indication that counsel did not view the remarks as so prejudicial that his client's right to a fair trial was seriously jeopardized." (Internal

take the time at any point in time to ever go down to the New Haven police station to give a statement."

quotation marks omitted.) *State* v. *Dillard*, 66 Conn. App. 238, 249, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001).

As previously noted, defense counsel did not preserve his claim for appeal by objecting to the prosecutor's argument or by requesting a curative instruction. The court did not intercede on the defendant's behalf to caution the prosecutor or to instruct the jury. On the basis of our review of the prosecutor's closing argument, we conclude that the prosecutor's remarks at issue were not improper. The prosecutor did not attack the credibility of the defendant, her sister and her friend by expressing his personal opinion. He commented on their testimony in evidence and asked the members of the jury to apply their everyday experience in assessing the credibility of the witnesses, including the defendant. Furthermore, the state's case was strong, given the eyewitness testimony implicating the defendant in the assault.

The defendant also claimed that the prosecutor's comment concerning her refusal to identify the perpetrator of the crime violated her right to remain silent. We disagree.

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965)." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 653, 783 A.2d 511 (2001). "When reviewing a claim that the prosecutor's comments violated a defendant's fifth amendment right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the

accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line . . . ." (Internal quotation marks omitted.) Id., 654.

In the present case, the defendant elected to testify on her behalf. She testified, in part, that she did not cut the victim and that she thought she knew who did. On cross-examination, the defendant admitted that she had an idea who slashed the victim, that she knew she was being arrested for the crime, but that she never told the police who she thought actually committed the crime.[7] The essence of the defendant's claim is not that

---

[7] The following cross-examination of the defendant by the prosecutor is relevant to our analysis:

"Q. Let me ask you this, Miss Denson, did Officer McKnight ask you, the night of this incident, did he ask you who cut Nateysha Poindexter Monk?

"A. Yes, he asked me because he knows me.

"Q. He does know you?

"A. Yes, he does.

"Q. And what did you tell him when he asked you that question as to who cut Nateysha Poindexter Monk?

"A. I told him that I didn't know.

"Q. But you just told us on the stand today that you have a pretty good idea who did it?

"A. I think so.

"Q. Didn't you give Officer McKnight that information?

"A. No.

"Q. You didn't?

"A. No.

"Q. You knew that Nateysha had been seriously cut, didn't you?

"A. Yes.

"Q. You knew that you were being arrested for doing this, right?

"A. Yes.

"Q. And you believe that you knew or possibly knew who was responsible, correct?

"A. I think so.

"Q. But you didn't tell him?

"A. No.

the prosecutor commented on her failure to testify, but rather on the fact that once having decided to testify, she failed to reveal the identity of the person whom she believed had committed the crime.

"It is elementary that a defendant who elects to testify in his own behalf is subject to cross-examination and impeachment just as is any witness. . . . [I]t is proper to attack a witness' credibility by evidence of his materially inconsistent statements." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 163 Conn. 304, 306–307, 306 A.2d 855 (1972). "Having voluntarily taken the [witness] stand, [the defendant] was under an obligation to speak truthfully and accurately, and the prosecution [may] utilize the traditional truth-testing devices of the adversary process." (Internal quotation marks omitted.) Id., 307.

The United States Supreme Court decided the issue claimed here long ago in the case of *Caminetti* v. *United States*, 242 U.S. 470, 493, 37 S. Ct. 192, 61 L. Ed. 442 (1917), which was cited by our own Supreme Court in *State* v. *Fienberg*, 105 Conn. 115, 134 A. 228 (1926). It is "the accused's privilege not to take the [witness] stand at all, in which case, of course, no comments could be made upon his failure or refusal to take the [witness] stand, and also he had the privilege of even taking the [witness] stand and confining his testimony to matters which he desired to testify to, and that he could not be cross-examined as to matters not covered by his direct testimony. . . . A defendant is not required under the law to take the witness-stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's

"Q. You just kept that to yourself, true?
"A. Yes. I told my lawyer."

silence; but where a defendant elects to go upon the witness-stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence." (Internal quotation marks omitted.) Id., 120–21.

Here, the prosecutor's closing argument concerning the defendant's failure to reveal the name of the individual who she believed had committed the crime after she put the issue into evidence was entirely proper. His remarks constituted fair comment on the evidence and the inferences the jury was entitled to draw from it. His comment amounted to a rhetorical question. He asked the jury to apply its common sense to the situation in which an individual who was under arrest for allegedly having committed a serious crime and who believed that someone else had committed the crime would not identify the alleged criminal to the police. The prosecutor merely challenged the defendant's credibility, and his comment did not constitute misconduct.

### III

The defendant's third claim is that when instructing the jury, the court diluted the state's burden of proof by improperly defining reasonable doubt. The defendant failed to preserve her claim at trial by submitting a request to charge or by excepting to the court's charge. We will review the defendant's claim under *Golding* because the record is adequate for our review and the claim is of constitutional magnitude. *State* v. *Morant*, 242 Conn. 666, 686–87, 701 A.2d 1 (1997); *State* v. *Green*, 62 Conn. App. 217, 242, 774 A.2d 157 (unpreserved challenge to jury instruction regarding reasonable doubt

satisfies second prong of *Golding*), cert. granted on other grounds, 256 Conn. 927, 928, 776 A.2d 1147, 1148 (2001). The court's instruction here, however, did not dilute the state's burden of proof, and therefore the defendant's claim does not satisfy the third prong of *Golding*.

The defendant challenges the following portion of the court's charge. "Proof beyond a reasonable doubt is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion."[8] The defendant claims, citing *State* v. *Foord*, 142 Conn. 285, 294, 113 A.2d 591 (1955), that the following lan-

[8] The court charged the jury on reasonable doubt as follows: "The law says that the state must not only prove her guilty, but must prove her guilty beyond a reasonable doubt. It is not enough for the state to make out a case of probable guilt, but the burden on the state, which never shifts, is to prove the defendant guilty beyond a reasonable doubt.

"It is not required that the state prove the defendant guilty beyond all possible doubt. The burden of proving her guilty beyond a reasonable doubt requires the state to produce sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the defendant. In other words, it is the law that the evidence must be so sufficient that it would leave no room in your minds for any reasonable explanation of the innocence of the accused.

"Proof of guilt beyond a reasonable doubt must exclude every reasonable supposition of innocence, but it need not exclude every possible supposition of innocence. A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise or speculation or conjecture or an imaginary doubt. A reasonable doubt is not a captious or frivolous doubt, nor is it a doubt which is raised by the ingenuity of a juror and unwarranted by the evidence, nor is it a doubt prompted by sympathy for the defendant. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence.

"Absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established as charged beyond a reasonable doubt. A reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs. Proof beyond a reasonable doubt is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion."

guage states more accurately the reasonable doubt standard: "It is, of course, true, as the defendants maintain, that any conclusion, reasonably to be drawn from the evidence, which is consistent with innocence of the accused must prevail."[9] We do not agree.

"In reviewing a constitutionally based challenge to the court's instruction to the jury, we must examine the charge as a whole to determine whether it is reasonably possible that the jury was misled by the challenged instruction." *State* v. *Adams*, 225 Conn. 270, 290, 623 A.2d 42 (1993). "It is well settled that a jury instruction is to be examined in its entirety, and that the test to be applied is whether the charge as a whole presents the case to the jury so that no injustice will be done. . . . The jury instruction in this case, viewed as a whole, adequately instructed the jury concerning reasonable doubt. The instruction clearly informed the jury that the burden to prove the defendant's guilt beyond a reasonable doubt rested entirely on the state at all times. Specifically, the instruction advised the jury that the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of the innocence of the accused . . . [and it] must exclude every reasonable supposition of innocence . . . . The instruction described the concept of reasonableness by noting that reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and more important matters relating to your own affairs. In explaining the concept of proof beyond a reasonable doubt, the instruction directed that it is *proof wholly consistent with the defendant's guilt and inconsistent*

[9] *Foord* relies on *State* v. *Guilfoyle*, 109 Conn. 124, 139, 145 A. 761 (1929), in which the standard was defined: "To warrant a judgment of guilty the evidence must be such as to establish the guilt of the accused beyond a reasonable doubt, and any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused, must prevail."

*with any other rational conclusion.* This language, taken as a whole, was adequate to apprise the jury of the heavy burden on the state and the defendant's presumption of innocence." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 818–20, 709 A.2d 522 (1998).[10]

Here, the language of the court's charge is almost identical to the language identified by our Supreme Court in *Hines* as the language necessary to convey the definition of reasonable doubt to a jury.[11] Taken as a whole, the court's instructions to the jurors in this case did not mislead them as to the state's burden of proof and the defendant's presumption of innocence. The defendant therefore cannot prevail on her claim of instructional impropriety.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[10] *State* v. *Hines*, supra, 243 Conn. 796, concerned a claim of instructional impropriety related to the state's burden of proof. In *State* v. *Hines*, supra, 817, our Supreme Court quoted *State* v. *Dash*, 242 Conn. 143, 698 A.2d 297 (1997), for the proposition that not every claim of instructional impropriety is of constitutional magnitude and, thus, such nonconstitutional claims fail to meet the second prong of *Golding*. Unlike *Hines*, however, *Dash* concerned a claim of instructional impropriety related to credibility. *State* v. *Dash*, supra, 150–51. Our Supreme Court distinguished constitutional from nonconstitutional claims of improper jury instructions in *State* v. *Dash*, supra, 152.

[11] "In explaining the concept of proof beyond a reasonable doubt, the instruction directed that it 'is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion.' This language, taken as a whole, was adequate to apprise the jury of the heavy burden on the state and the defendant's presumption of innocence." *State* v. *Hines*, supra, 243 Conn. 820.